## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
## AT KNOXVILLE, TENNESSEE

United States of America,      :

                             :

               Plaintiff,     :

vs.                         :       Case No. 3:12-cr-171

                             :

Steven Marshall Fout,      :       **Sentencing**

                             :

              Defendant.   :

      Transcript of proceedings before the Honorable Danny C. Reeves,

U. S. District Judge, on February 20th, 2014.

Appearances:

                  On behalf of the Plaintiff:

                    Matthew T. Morris, Esq.
                    U.  S. Attorney's Office
                    Knoxville, Tennessee

                  On behalf of the Defendant:

                    Bobby E. Hutson, Esq.
                    Federal Defender Services, Inc.
                    Knoxville, Tennessee

Court Reporter:

                    Donnetta Kocuba, RMR
                    800 Market Street, Suite 132
                    Knoxville, Tennessee 37902
                      (865) 524-4590

I  N  D  E  X

Oral Argument re: Defendant's Motion for Downward Departure and/or
 Variance:

        by Mr. Hutson -                    6, 33

        by Mr. Morris  -                    25

Court's Ruling on Motion:                    34-40

Defendant's Statement:                    40


Plaintiff's Witness:                    Direct    Cross    Redirect    Recross

    Agent Richard Lara                    52        54          –              –



Sentence of the Court:                    59

Defendant's Objections to Sentence:    68

Court addresses Deft.'s Objections:    73

1    (Whereupon, Thursday, February 20ᵗʰ, 2014, Court convened

2    in the following matter at 2:00 p.m.)

3          THE COURT:  Thank you. Once again, good afternoon.

4    Madam Clerk, if you could call the matter scheduled for 2:30,

5    please.

6          COURTROOM DEPUTY:  Yes, your Honor. We're here

7    for a sentencing in Docket Number 3:12-cr-171, United States of

8    America versus Steven Marshall Fout. Is the Government present

9    and ready to proceed?

10          MR. MORRIS:  Matthew Morris present and ready, your

11    Honor.  Thank you.

12          COURTROOM DEPUTY:  Is the Defendant present and

13    ready to proceed?

14          MR. HUTSON:  Bobby Hutson, present and ready.

15          THE COURT:   All right.  Thank you, counsel. This

16    matter is scheduled for a sentencing hearing this afternoon. Before

17    we proceed with the hearing, I want to first confirm, Mr. Fouts[sic]

18    has had the opportunity to review his pre-sentence report and also

19    to discuss it with his attorney to his satisfaction; is that correct,

20    Mr. Fouts [sic]?

21          MR. FOUT:  Yes, sir.

22          THE COURT:   Mr. Fouts [sic], your pre-sentence report

23    will be placed in the file, under seal. It is available if you should

24    need it for any reason or if the attorneys should need it for any

25    reason, but it's not available for the general public to review. You

1    do understand that?

2              MR. FOUT:   Yes, sir.

3              THE COURT:   All right. There are objections to the

4    pre-sentence report that will need to be addressed before we can

5    proceed with the sentencing hearing.

6         I will note for the record that I have reviewed the extensive

7    motion that has been filed on behalf of the Defendant, a motion for

8    downward departure or for a variance from the Advisory Guideline

9    Range, and the sentencing memorandum that's been filed.

10   Likewise, the United States has filed a memorandum in opposition

11   to the Defendant's motion.

12        I have considered those matters, as well as the authorities that

13   have been cited in those memos and will proceed at this time on the

14   Defendant's objections to the report.

15             MR. HUTSON:   Your Honor, we did not file an

16   objection to the report, but I would like to be heard in terms of

17   argument in this case.

18             THE COURT:   All right.  Yes, sir.

19             MR. HUTSON:   Would you like me to proceed, your

20   Honor?

21             THE COURT:   Yes. I do have a couple of questions for

22   you. I mispoke. It's not objections to the report, but it is a motion

23   for downward departure.

24             MR. HUTSON:   And/or variance, your Honor.

25             THE COURT:   And/or variance. I've read your

1    memorandum, and it may be helpful if I raise the questions with

2    you in advance that you will be able to address.

3            There is some authority from the Sixth Circuit, rather recent

4    authority, within the past year or so, <u>United States vs. Reilly</u>,

5    which indicates that the only departures that are appropriate for

6    these type of offenses would be departures under 5K. Now,

7    specifically– and I'll refer you to the guidelines, 5K2.0,

8    Subsection (b), downward departures in child crimes and sexual

9    offenses.

10           Specifically, on Page 454 of the Guideline Manual for 2013, it

11   specifically states that, "The grounds enumerated in Part K of

12   Chapter Five are the sole grounds that have been affirmatively and

13   specifically identified as permissible grounds of downward

14   departure in these sentencing guidelines and policy statements.

15   Thus, notwithstanding any other reference to authority to depart

16   downward elsewhere in this Sentencing Manual, a ground of

17   downward departure has not been affirmatively and specifically

18   identified as a permissible grounds of downward departure within

19   the meaning of Section 3553(b)(2) unless it is expressly

20   enumerated in Part K as a ground upon which a downward

21   departure may be granted."

22           Now, 5K, of course, contains a number of sections, and

23   specifically Section 5K2.22, that section provides that there are

24   some grounds for departure that can be considered from other

25   chapters, 5H1.1 and 5H1.4. It does not mention 5H1.3, and I do

1    know that in your memorandum you specifically refer to that

2    section as well.

3           But it would appear to me, under the authority that I've

4    mentioned, as well as United States vs. Reilly– and the citation of

5    the Reilly case is 662 Federal 3d 754, it's a 2011 case, and that

6    specifically holds, as indicated in the subsection I've just

7    referenced.

8           It does, of course, indicate that that information can be

9    considered in terms of a variance, but not a departure, and I am

10   referring to the 5H1.3 argument that has been made in the

11   memorandum. So I wanted to alert you to that before hearing your

12   argument on the issue of departure or variance.

13           MR. HUTSON:   Thank you, your Honor.  Would you

14   like for me to proceed?

15           THE COURT:   Yes, sir.  Yes.

16           MR. HUTSON:   May it please the Court, your Honor,

17   before the Court today is Mr. Steven Marshall Fout. As outlined in

18   our motion for downward departure and variance, Steven asks the

19   Court to impose a sentence below the excessive guideline range

20   currently recommended by the pre-sentence report, which

21   recommends a 12- to 15-year sentence in this case.

22           Specifically, he asks the Court to impose a 60-month

23   sentence, to be followed by a reasonable term of home detention.

24   He leaves that specific term to the sound discretion of the Court,

25   coupled with the stringent conditions of supervised release that are

1   in place for an offender like Steven.

2          THE COURT:   As I understand your argument, you're

3   not objecting to the standard conditions of supervised release that

4   have been adopted in this district?

5          MR. HUTSON:   That's correct, your Honor.

6          THE COURT:   All right.

7          MR. HUTSON:   We raise no objection to those

8   conditions.

9          THE COURT:   All right. Thank you.

10          MR. HUTSON:   In essence, Steven is asking for a split

11   sentence, to be comprised of both a term of imprisonment in a

12   Bureau of Prisons facility in combination with home detention.

13   First and foremost, both Steven and myself certainly appreciate the

14   Court's indulgence in allowing us to file such an extensive

15   sentencing memorandum for these important issues.

16       It's not the typical practice for us to file a memorandum of

17   that length, but this is not the typical defendant in federal court.

18   For purposes of efficiency today, though, your Honor, I'll just

19   briefly highlight some of the most important facts in the case.

20       Your Honor, we submit to the Court that this case does fall

21   outside the heartland of cases normally considered by the

22   sentencing guidelines. I have, just anecdotally speaking, I have

23   spoken with other lawyers in my office, and we typically handle

24   every federal child sex case that comes through town, unless

25   someone retains counsel, and no one has encountered a defendant

1    like Steven.  He is different, and he's different for a variety of

2    reasons.

3         Your Honor, it is undisputed that Steven is a legally blind

4    defendant who has pled guilty to possessing and distributing child

5    pornography. Medical records received by probation establish that

6    fact.  He has attended the Tennessee School for the Blind and has

7    needed visual assistance since he was nine years old.

8         THE COURT:  Which indicates that he had this

9    condition at the time that he committed the offenses.

10        MR. HUTSON:  That is correct, your Honor.

11        THE COURT:  And if you're successful in your motion,

12   he would continue to have the ability to commit similar offenses

13   based upon his handicap. His handicap would not prevent him from

14   committing those offenses, correct?

15        MR. HUTSON:  I would, I would probably characterize

16   that in a different way, in that the conditions imposed by the Court,

17   coupled with a term of imprisonment, would be sufficient in

18   addressing both the statutory factors and the departure provisions.

19   But I understand–

20        THE COURT:  Well, wasn't he being supervised by his

21   mother and grandmother at the time that he committed these

22   offenses?

23        MR. HUTSON:  He was living in her home, and as I will

24   mention in the next section, your Honor, they, when this occurred

25   in 2009– mind you, that was almost five years ago– Steven's family

1    cooperated with authorities. They handed over the computer. No

2    one attempted to hide or conceal evidence from authorities. They

3    were not aware that Steven was downloading child pornography.

4         THE COURT:   And I guess that's my point. He was able

5    to avoid detection notwithstanding his physical impairments. He

6    was able to commit the offenses that he's here today, in light of the

7    fact that he had these conditions and he had supervision by his

8    family, and they didn't know what he was doing. They didn't

9    realize he was doing this.

10        MR. HUTSON:   Yes, your Honor. But I would also add,

11   though, that once that occurred, that there doesn't appear to be any

12   evidence that he downloaded child pornography following that

13   event, when they had him under supervision, knowing that he was

14   downloading child pornography.

15        Now, the Government has– the pre-sentence report alleges

16   that he may have been involved in chat room activities, but,

17   nevertheless, there's no indication that he re-offended with the

18   offense conduct that he's here for today following that 2009,

19   intervention between law enforcement and Steven.

20        Additionally, your Honor, Steven cannot drive a car to the

21   store, he can't drive to a playground, he can't drive to the mall, he

22   can't go from Point A to Point B without some type of help,

23   without some type of supervision from an adult, and he's been that

24   way for almost 15 years.

25        And so this is an ongoing issue that did not just develop at the

1    onset of a federal case, but an issue that has existed since he was a

2    child. Most of Steven's medical issues can be traced to the trauma

3    he experienced as a child.

4        At nine years old, he was diagnosed with brain cancer, a rare

5    form of brain cancer. He lost most of his sight due to a tumor that

6    grew on his optic gland. Steven was also chemically sterilized due

7    to the intense chemotherapy treatments that he received as a child.

8    Fortunately, he was able to go into remission, but he still requires

9    assessments to examine the tumors in his head.

10       The family has indicated that any fall or blow to his head

11   could create a serious, if not fatal, situation for Steven, given the

12   fact the tumors can rupture, hemorrhage inside of his brain.

13       THE COURT:   Now, you're not arguing that he couldn't

14   receive proper assessments at a medical facility, a federal medical

15   facility?

16       MR. HUTSON:   Your Honor, I'm not aware that the

17   Bureau of Prisons is able to handle a person just like Steven. I

18   can't, I can't say today that I'm confident that the Bureau of

19   Prisons will be able to carry out, at the stay of a defendant like

20   Steven, for which the guidelines recommend, 12 to 15 years.

21       THE COURT:   Well, is your argument irrelevant if the

22   Court sentences him to a term of 60 months? He's still going to be

23   subject to falling and injuring himself just as much as he would at

24   some more lengthy term of incarceration.

25       MR. HUTSON:   Well, I think, just in terms of the term

1    itself, the longer he is in prison, the more likely it is that he will be

2    subject to abuse or a fall, and the Court has a mandatory minimum

3    that is present in this case that we can't argue against. So that

4    would be our rationale for raising the issue in that manner.

5          Additionally, your Honor, Steven's status– and this goes to

6    your Honor's last question– Steven's status as a blind defendant

7    who is convicted of a child pornography offense, would create

8    potentially a serious safety risk for Steven in a Bureau of Prisons

9    facility.

10         It is not unreasonable to assume that a defendant like Steven

11   will be subject to abuse as a federal inmate. He is five-foot-two,

12   and I believe he weighs approximately 125 pounds– 116 pounds,

13   rather, today, your Honor.  And, with all due respect to Steven, he

14   does have a meager physical appearance and traits. This, coupled

15   with a disability, makes him particularly vulnerable to a plethora

16   of assaults, including both sexual assaults and non-sexual assaults,

17   as a federal inmate.

18         A split sentence, though, that includes home detention, will

19   not only punish Steven for the offense conduct in this case, but it

20   will also properly balance his history and characteristics as it

21   relates to this specific case.

22         And as the Court is aware, home detention is punishment, is

23   long considered to be punishment, and that is especially true when

24   you have a defendant like Steven, who, it's undisputed, he has both

25   learning and physical limitations. The pre-sentence report actually

1    notes that he is considered to be a low, borderline, low-functioning

2    adult male.

3            THE COURT:   That, standing alone, would not be

4    sufficient for a departure. Many defendants that appear before the

5    Court have learning disabilities, and quite a few have substantial

6    physical disabilities. I believe your argument is, it's the

7    combination of all these factors; is that correct?

8            MR. HUTSON:   That's correct, your Honor.  And that's

9    our rationale for raising the issue in 5.K, which is a combination–

10   does raise the issue of whether the combination of one's physical

11   and mental characteristics could warrant a departure.

12       But, as the Court noted at the beginning of the hearing, we're

13   not making a single request related to a departure. These same facts

14   should also be considered with the statutory factors, which may be

15   a better analysis for the Court in terms of reaching a decision in

16   this case. But we ask the Court to consider both of those for

17   Steven.

18       Your Honor, as noted by the pre-sentence report and our

19   memorandum– and I did discuss this with Steven before the

20   hearing, because the memorandum was sealed. He did give me

21   permission to speak on these issues today with the Court.

22       But, as the Court knows, Steven was violently raped by a

23   person that was entrusted to protect him, his stepfather. This was

24   during the same year that Steven was battling brain cancer as a

25   little boy. Not only did Steven have to endure the legal stress of

1   convicting a parent of rape, but he also had to fight for his life,

2   knowing that he is a victim of rape.

3        And so these events in his life have left him wounded. He has

4   post traumatic stress disorder, depression, anxiety, he is

5   symptomatic of bipolarism; and these issues together create a

6   person who needs attention, who needs counseling and medication,

7   which he is currently receiving at the local facility.

8           THE COURT:   Don't those conditions also indicate a

9   greater likelihood of recidivism, an individual who's been sexually

10  abused, who then strikes out at the most vulnerable and sexually

11  abuses those individuals, or would like to, or possesses child

12  pornography which is of the worst kind?

13       The pornography that's described in this case is really the

14  worst of the worst. It's a very aggravating factor; it's not a

15  mitigating factors. It's horrendous, and I don't want to even

16  describe it, but it's certainly described in the pre-sentence report.

17          MR. HUTSON:   It is, your Honor, and he is aware of the

18  horrific nature of this crime. I would say that courts have, and this

19  is touched upon in the memorandum, courts have viewed child

20  pornography differently than they have, for instance, an

21  enticement case, where an individual can actually go after a six-

22  year-old and her, quote, mother and have a guideline sentence of

23  eight years or a statutory minimum of ten years. That's the reason

24  courts find these guidelines so unreliable in determining whether a

25  specific sentence should be attached to a specific defendant.

1       THE COURT:   That argument's often made, that the

2   guidelines really don't reflect the nature of the offense. And

3   there's an article that was written by Alexandra Gelber a couple

4   years ago. She's with the Department of Justice, in the criminal

5   division in Washington, and her article is captioned "A Response

6   to 'A Reluctant Rebellion.'"

7       Now, that "Reluctant Rebellion" was an article that appeared

8   in an ABA Journal back in June of 2009, and it basically attacked

9   the guidelines as creating a very harsh sentencing environment

10  with the enhancements that are applied for a variety of things using

11  a computer, number of images, sadistic images.

12      And she goes through literally and explains the reason for

13  each one of those adjustments that are made, and she does an

14  excellent job in doing so. I would certainly refer you to her article.

15  It's very good.

16      And I would also refer you to an opinion, a couple of

17  opinions. Recently, from the Sixth Circuit, I think a couple of these

18  are actually referenced in the memos that have been filed. One is

19  from Judge Kethledge– I believe actually two from Judge

20  Kethledge, the Bistline case, the two cases.

21      That was a series of cases in which Judge Graham decided that

22  an elderly defendant really didn't deserve any jail time at all, and I

23  guess you'd call it a judicial smack-down. Judge Kethledge, the

24  first time, threw– or reversed the case and told the district judge

25  that Congress really intended to– that it meant what it said in these

1    cases, that these are serious cases and they should result in serious

2    punishment.

3        Judge Graham didn't do that the second time, and the case,

4    when it was remanded the second time, the case was taken away

5    from him for sentencing before another judge.

6        And then, in another opinion, <u>Shultz</u> case– I believe it was a

7    case from Tennessee, as a matter of fact– involved supervised

8    release terms, but I believe Judge Sutton, in that case, really

9    discusses congressional intent as well, and there are several cases

10   in which that occurs.

11       But hasn't the Sixth Circuit really come full circle in the last

12   couple of years, and they've taken a more serious look at the

13   guidelines with regard to these type of offenses?

14            MR. HUTSON:  Your Honor, I would respectfully

15   disagree with some of those cases and positions by the Sixth

16   Circuit in that the Supreme Court has determined that the statute is

17   the most important, the statutory factors.

18       And in many of the cases– and I won't begrudge the Court by

19   going through the statistics that we've already presented, these

20   enhancements are implied in every case for the most part. In every

21   case, mostly every case that I have, the same enhancements are

22   present in the same case regardless– all child pornography is

23   horrendous; that is another undisputable fact.

24       But at the same time, when the enhancements are applied in

25   every single case, it doesn't have the– that doesn't create an

1    individualized determination of whether a sentence is appropriate

2    post-<u>Booker</u>. And so I believe that's where the tension lies between

3    one side of the argument, where this is a horrible offense and we

4    have to aggressively apply every enhancement regardless of, you

5    know, of the Defendant's history and characteristics.

6        Because the guidelines are not anticipated to address a legally

7    blind defendant who is confined to his home. He's not the typical

8    defendant described in the guideline.

9        And while I respect the opinion of the person with the

10    Department of Justice who filed the article– and I'll certainly

11    review that– I do respectfully disagree with that position. And

12    maybe I can address some of those issues further along in the

13    argument, your Honor.

14        Steven's history is not just this happened to him. It's this

15    happened to him, this happened to him, this happened to him; and it

16    has created a person who is anything but intellectually superior to

17    the normal person. Steven is competent to be here today, there's no

18    question of that, but Steven is not a normal defendant.

19        And I understand the Court's argument about, yes, we see a

20    lot of defendants who may be struggling and in a variety of areas,

21    and oftentime my clients are not the smartest people to deal with.

22    But, at the same time, Steven, the multiplicity aspect of Steven's

23    history and characteristics does, in my opinion, present the Court

24    with a different type of case.

25        THE COURT:  Are we given some insight, with the

1    Internet chat, with his intellectual capacity, his ability to

2    communicate with others on these particular issues? Not a low-

3    functioning communication; he was able to carry on some– I don't

4    want to call it sophisticated, but the Internet chats were not what I

5    would call low-functioning.

6         MR. HUTSON:   Your Honor, I would make two points

7    for that. The pre-sentence report classifies those Internet chats as

8    allegations, and Steven is not here today to stipulate to any

9    additional criminal conduct that has been alleged.

10        THE COURT:   No. And I'm not referring to it in that

11   way. But it really addresses your argument of his intellectual

12   capacity. He's not the low-functioning individual that you argue

13   that he is based upon that type of– that ability to communicate.

14        MR. HUTSON:   Your Honor, I have read the chats, and

15   while I understand there's a section of the chats, assuming

16   arguendo, Steven is carrying out these chats, just hypothetically

17   speaking, there is, in the chats itself, from my reading of the chats,

18   yes, some of it is horrible, there's no question about that.

19        But then other parts of it make absolutely no sense. There are

20   exchanges between the individuals where Steven is really, you

21   know, theoretically, responding in a way that's even responsive to

22   the commentary that's going back and forth. So I'm not sure that

23   saying the chats make him a more culpable defendant, I'm not

24   saying I would necessarily agree with that, given the entirety of the

25   chat itself.

1    So, your Honor, I understand the Court would want to

2    consider those issues, but, again, Steven, Steven does not stipulate

3    to any other allegations that may have been raised by the pre-

4    sentence report, because they are raised as allegations.

5    Your Honor, I would also note that, you know, when Steven

6    was an adolescent, he was subject to intense bullying at school

7    based on the things that we're arguing about, his physical and

8    emotional and learning disabilities. Those issues created a volatile

9    atmosphere for Steven at school.

10    Steven routinely was tortured by classmates. He would come

11    home, he would have visible bruises on his body. He would have

12    red handprints embedded on his face from being abused by

13    classmates.

14    THE COURT:   None of that is going to change

15    regardless of the sentence that's imposed here today. It's

16    unfortunate, I certainly agree with you, that's unfortunate. That

17    should never happen; children should not be abused. Sometimes,

18    though, attorneys forget who the true victims are in these cases.

19    The victims in these cases are the children in those pictures,

20    the toddlers that are being abused. It's Steven years ago. He went

21    through the abuse, and he's been broken. He's competent, but we

22    have a broken child who becomes a broken adult, who creates and

23    who engages in terrible conduct.

24    The sentence that's imposed here today will not change that.

25    You can't go back and take away the bruises or the marks, the

1   things that have happened. If anything, the abuse is an indication

2   that in the future he's likely to commit other abusive conduct

3   toward children. He acts out, he acts out toward those that are more

4   vulnerable than he is. That's been his history.

5        So that's the problem here, is the fact that– and I understand

6   your argument. Your argument is, the Court should essentially give

7   him credit or give him some time off because he was abused as a

8   child. But we're not going to change that by reducing his sentence.

9   He's still going to be the same person.

10       His characteristics will not change, the likelihood that he

11  would reoffend are not going to change, by a lesser sentence.

12  Treatment may be helpful, but I don't see how a lesser sentence

13  will change any of that or cause him to be less likely to re-offend.

14       MR. HUTSON:   Your Honor, I guess I would answer

15  that with three points, and the first point is that the history and

16  characteristics of Steven as being a vulnerable defendant, we

17  suggest, should be a part of the Court's analysis in the case.

18       A 60-month sentence in a Bureau of Prison facility is more

19  dangerous to Steven than a 12- to 15-year sentence for Steven. Just

20  by the numbers alone, with Steven being subject to an extended

21  term of imprisonment, there is more likelihood that Steven will be

22  attacked, abused, assaulted. So the Court does have discretion

23  today to change some of those issues with the sentence in the case.

24       And, secondly, your Honor, and just for purposes of the

25  record, Steven objects to any prior acts of acting out. And we also

1    disagree that that is necessarily a telltale sign that someone will act

2    out again. There are defendants who have been abused and never

3    act out.

4         And so, just for purposes of the record, the pre-sentence

5    report actually identifies those as allegations–

6              THE COURT:   Aren't you arguing against yourself?

7              MR. HUTSON:   How so, your Honor?

8              THE COURT:   Well, part of the argument that you make

9    either for a variance or for a departure is based upon the actions

10   that have taken place previously in his life, including being raped

11   by a stepfather.

12        And your argument is that that may have caused some of his

13   actions that he's convicted of; children that are abused abuse

14   others. He was abused as a child. That may have led to the

15   pornographic material that he was observing, he possessed and

16   distributed, of children being abused.

17        So, as I understand, your argument– correct me if I'm wrong–

18   but I understand your argument to be, because of those actions as a

19   child, this resulted in his conviction, the actions that he took that

20   resulted in his conviction.

21        But you're also saying, well, there's no guarantee that he

22   would re-offend or that he would act out in the future. You're

23   saying there's no relationship. On the one hand, you're saying

24   there is a relationship, and then you're saying, well, it really isn't a

25   relationship that the Court can count on.

1          MR. HUTSON:   Your Honor, I would, I would

2   respectfully disagree with that, in that we have, in our filings, have

3   never stated that because Steven was abused he committed child

4   pornography. The statute requires us to examine the history and

5   characteristics of the Defendant, and these, this history and

6   characteristics of Steven, are important.

7          And I wouldn't be worth two salts as a lawyer if I did not

8   bring the Court's attention to the things that have happened to

9   Steven in his life. We have never taken the position that Steven's

10  history created an atmosphere where he decided to download child

11  pornography, but it is a part of who he is and it's a part that I can't

12  change for him.

13         I would also add, your Honor, that, in this case, that Steven

14  has accepted responsibility for downloading child pornography,

15  again, child pornography that was downloaded nearly five years

16  ago. In that instance, your Honor, the Court is also required to look

17  at the deterrent effect, under the sentencing statute.

18         In terms of that, your Honor, Steven did not seek pretrial

19  release, Steven did not create any additional issues for the

20  Government. He immediately, as mentioned, accepted

21  responsibility not only at the scene in 2009, but when he was

22  indicted in federal court.

23         Steven understands that downloading child pornography is a

24  horrific offense, and he has– and he intends to never re-offend with

25  that offense again, your Honor.  Most importantly, as I alluded to

1    in terms of the deterrent part of those facts, under 3553, the fact

2    that these events occurred five years ago, when he was 19 years

3    old, approximately 19 years old, I believe– and now he's a 23-year-

4    old– a significant amount of time has passed from the offense

5    conduct to date.

6          Consequently, your Honor, it appears that the deterrent aspect

7    of the sentencing statute could be satisfied, given the facts of this

8    specific case. Your Honor, regardless of how we look at this case,

9    the source of the problem is the Internet, the computer. That's the

10   source of the problem.

11         The statute requires that the sentencing court pronounce a

12   sentence that is not greater than necessary. Aside from the

13   guidelines, the statute requires that the sentence not be greater than

14   necessary to achieve the statutory purpose of 3553. Respectfully, if

15   the Court were to impose a five-year sentence followed by a

16   significant or extended term of home detention, which is– includes

17   the stringent conditions of supervised release for a sex offender, it

18   appears that the purpose of 3553 could be satisfied in this case.

19         Stated a different way, a sentence of 12 to 15 years seems to

20   be greater than necessary for a legally blind defendant who cannot

21   even visit the grocery store without some type of assistance. It

22   seems as if ordering him to be confined at his home, with

23   monitoring and supervision or any other condition that the Court

24   feels would be appropriate could be a reasonable sentence in this

25   case.

1        Your Honor, the guidelines are helpful in many cases, but in

2    this case they simply do not contemplate a defendant that has the

3    combination of history and characteristics as Steven.

4        Also, your Honor, I won't go on about this issue, but there are

5    serious disparities in these types of cases. And I respect the Sixth

6    Circuit and their opinions regarding to the <u>Bistline</u> case and its

7    progenies, but at the same time there are many other districts and

8    courts that have found that the Sentencing Guidelines do not

9    provide a proper basis for a criminal defendant in terms of child

10   pornography offenses.

11       Certainly, the Court would not be creating any new precedent

12   per se if the Court granted a variance of some kind in the Sixth

13   Circuit related to the statutory factors. Your Honor, Steven is, as

14   mentioned, he's vulnerable to abuse in the system. An extended

15   term of imprisonment will only prolong that period of time in

16   which he is subject to abuse.

17       He requires both mental and psychological treatment and has

18   the supportive framework of family members that love and support

19   him. Your Honor, his family would assist the Court in any way

20   needed to insure that he is compliant with all terms of supervision,

21   including any additional orders by the Court.

22       They are here today and can certainly answer any questions

23   the Court may have, if necessary. They are willing to completely

24   restrict Steven's Internet usage, computer usage, whatever the

25   Court needs to satisfy the statutory factors of 3553.

1    They're also willing to pay for ankle monitoring, to take him

2    to sex offender treatment, which, my understanding is, sex

3    offender treatment is voluntary within the Bureau of Prisons, but

4    once an individual is released, it becomes mandatory. And so that

5    may give the Court the option of getting Steven treatment faster in

6    a way in which he can become a different person and, hopefully, be

7    a contributor to society.

8         Your Honor, based on these reasons and those found in our

9    sentencing memorandum, Steven asks the Court to impose a

10   sentence of 60 months, followed by a reasonable term of home

11   detention. He has raised no objection to the special conditions, as I

12   mentioned earlier, and he's ready to fulfill those obligations.

13              THE COURT:   All right.

14              MR. HUTSON:   Finally, your Honor, I have two last

15   points, if I could. The first is, is that, pursuant to Booker and its

16   progenies, the Court has a great deal of flexibility in how to handle

17   this case. Theoretically, for example, if the Court were to sentence

18   Steven to five years and follow that with a seven-year term of home

19   detention with supervised release and special conditions, that

20   would in essence equate the same amount of confinement for– that

21   is represented by the guidelines.

22        Of course, the Court would likely have to vary, but at the

23   same time, your Honor, there is a way for the Court to fashion a

24   sentence in this case that takes into account the entire landscape of

25   the facts before the Court.

1          And, lastly, your Honor, clearly, the decision by the Court

2    today is going to have an enormous impact on Steven's family and

3    Steven himself. And the family certainly recognizes the difficult

4    nature of the issues before the Court today, and they sincerely

5    appreciate the Court's consideration of Steven's request. Thank

6    you.

7          THE COURT:   All right. And thank you for responding

8    to my questions as well.

9          MR. HUTSON:   Thank you.

10          THE COURT:   Mr. Morris, would you like to respond?

11          MR. MORRIS:   Yes, your Honor. Thank you. Your

12    Honor, in response to a few of the things that have been raised by

13    counsel for Mr. Fout, one of the last things he said, which I do take

14    issue with, he said the source of the problem is the Internet. The

15    source of the problem is Steven Fout. The world is full of people

16    that use the Internet and never distribute child pornography.

17          THE COURT:   It's like your argument about guns, isn't

18    it?

19          MR. MORRIS:   Pardon me, your Honor?

20          THE COURT:   Kind of like the argument about guns–

21          MR. MORRIS:   Yes, exactly.

22          THE COURT:   – guns don't kill people, people kill

23    people?

24          MR. MORRIS:   Exactly, your Honor. So I do take issue

25    with that statement. Some of the things that counsel also

1    mentioned, one of the things he had mentioned was, well, these

2    enhancements apply in all the cases and, therefore, the Court

3    should give them less deference because they don't differentiate

4    between different types or different levels of severity of offenses.

5         But the statistics that he cited himself show that almost 30 per

6    cent of the defendants did not receive an enhancement for sadistic

7    or masochistic depictions, 29 per cent of defendants possessed less

8    than 600 images of child pornography, and over 26 per cent of

9    defendants did not possess images portraying other forms of

10   violence.

11        So his argument almost swallows itself, because, while they

12   commonly apply, and outside of the child pornography context,

13   there are sentencing enhancements that apply to almost every

14   defendant, and it is not a cause for ignoring them, and I would

15   respectfully submit that, in a case where one would not apply, that

16   would be a basis to say this one isn't as bad and we should give a

17   less, lesser punishment.

18                THE COURT:   Mr. Morris, I don't know the answer to

19   this question, but what's the old quote from Mark Twain, "There

20   are lies, there are damn lies, and there are statistics"?

21                MR. MORRIS:   That's true, your Honor.

22                THE COURT:   Are the statistics skewed in a situation

23   where the federal government is only bringing the more serious

24   cases; in other words, where there's some discretion about which

25   cases to bring and which cases not to bring?

1      If you have that discretion, I would assume that you're taking

2   the serious cases, and as a result, the cases that you're taking, the

3   serious cases, are going to be subject to these enhancements,

4   greater enhancements, and that's going to drive, again, that will

5   drive the statistics. Am I wrong or–

6           MR. MORRIS:   Your Honor–

7           THE COURT:   – every case that comes in the door,

8   these child pornography cases?

9           MR. MORRIS:   It is, your Honor. We don't prosecute

10  every case that comes in the door, and the law enforcement

11  community does not necessarily pursue every case that comes in

12  through the door.

13      I have a matter that was in my office this week, and we didn't–

14  we basically felt like that it wasn't serious enough to warrant the

15  limited resources of federal prosecution. So your Honor is right,

16  we do pick the worst of the worst.

17      And, unfortunately, there are a lot of these cases out there,

18  and we just can't do them all. And so when a defendant such as Mr.

19  Fout comes in and complains about all these enhancements

20  applying to them, it's just for that reason. We exercised our

21  prosecutorial discretion and chose his case as one of the worst of

22  the worst for prosecution in the federal system.

23          THE COURT:   What about his argument, if you could,

24  if you could address his argument, that he would be treated

25  differently within the prison system, that he may be subject to

1  abuse based on his unique characteristics?

2          MR. MORRIS:   Well, your Honor, one of the things, in

3  researching for this case, I came across– and I do not have it for the

4  Court, but I can quote, I can quote to you, to the Court, testimony

5  from a case in the Eastern District of New York, in the case United

6  States vs. C.R. in which the director of the– the coordinator of the

7  sex offender management program at the Federal Medical Center in

8  Devens, Massachusetts, was asked about this very thing.

9          The question posed: "What sort of safety measures do B.O.P.

10  institutions take to protect sex offenders from potential inmate-on-

11  inmate violence?

12          "Answer: Well, largely, all inmates who come into bureau

13  custody are informed of the rules and are informed that there is no

14  tolerance for any type of harassment, any type of threats, violence,

15  and so on. And inmates are informed of the procedures that they

16  should follow in the event they feel threatened, harassed, or

17  otherwise uncomfortable with regard to how other inmates interact

18  with them.

19          "And one of the primary means of prevention is open

20  communication between staff and inmates. At Sex Offender

21  Management Protection institutions, sex offender management –"

22  I'm sorry "–sex offender management program institutions,

23  certainly at Devens, I can attest to the fact that every day they do

24  talk to us if they are feeling uncomfortable.

25          "Typically, staff would follow up by determining whether or

1   not there is any degree of threat to that individual. Sometimes it

2   means putting someone in a more secure environment so they can

3   determine whether or not there is a threat. Sometimes it means that,

4   if a threat is verified, that individual might be transferred. They

5   need to separate inmates involved. So there are a number of

6   procedures we have in place.

7          "Question: Are there certain housing units that are designated

8   for inmates who may be more susceptible to inmate-on-inmate

9   violence?

10         "Answer:  Each institution has housing units that are

11  designated to increase or to optimize, I guess, supervision for the

12  inmates; however, for instance, we have special housing units.

13  Placement in those environments is not ideal. We want inmates to

14  be able to function in an open compound. So what we do is, if there

15  are allegations, we may potentially be in a position, where we have

16  pending investigations, place inmates in a special housing unit to

17  determine if there is a threat."

18         So the witness, who's named as Cheryl Renaud, R-e-n-a-u-d,

19  who is the coordinator of the sex offender treatment program at one

20  of the federal facilities designed to treat sex offenders, has laid out

21  a number of procedures that the Bureau of Prisons utilizes to

22  protect inmates that might be subject to inmate-on-inmate

23  violence.

24         Another thing that I learned in this research, your Honor, and

25  I would proffer to the Court, that these defendants who are in these

1    programs are in a– one of six federal institutions that house– that

2    try to maintain a 40 per cent sex offender population in those

3    facilities. So he would not be alone, he would not be the only

4    person that was in a sex offender management program, and that

5    the Bureau of Prisons strives to protect people like Steven from

6    any sort of inmate-on-inmate violence.

7                THE COURT:   The location would be closest to

8    Knoxville would be Butner, North Carolina?

9                MR. MORRIS:   I think so, your Honor. I think that's

10   correct.

11               THE COURT:   Is that also a medical facility?

12               MR. MORRIS:   It is, your Honor. That's my

13   understanding, it is.

14               THE COURT:   Do you have any statistics on the number

15   of individuals that are in the federal prison system that are blind,

16   legally blind?

17               MR. MORRIS:   I do not, your Honor.

18               THE COURT:   Are you aware that there are individuals

19   that are blind?

20               MR. MORRIS:  That would make sense, your Honor, yes.

21               THE COURT:   It's my understanding. I wanted to see if

22   you had a different understanding. Do you believe that's correct?

23               MR. MORRIS:   I believe it is correct, your Honor.

24   And, you know, as the Court pointed out, the Defendant, though

25   legally blind, certainly could see well enough to commit the

1    offenses for which he is here today. Legal blindness, while

2    unfortunate, your Honor, is, I don't feel like, based upon my

3    experience, something that takes him out of the heartland and is

4    something that the Bureau of Prisons would not be equipped to deal

5    with if he were incarcerated, when he is incarcerated for these

6    offenses.

7          Your Honor, in your discussion with counsel for Mr. Fout,

8    your Honor responded to some of his points with many of the

9    points that I made in my response to his request for a downward

10   departure or variance, and unless the Court has other questions of

11   me, your Honor, I would, I would stop. I don't want to belabor the

12   point.

13         I was prepared to address some of the conditions of

14   supervised release, but the Defendant has indicated he has no

15   objection to them. And I would simply close by pointing out, your

16   Honor, that much of the focus of this hearing and, of course, of the

17   Defendant's filing, has been on Steven, and we can't lose focus on

18   the victims in this case and the effects that offenses like the

19   Defendant's have on them.

20         We can't forget that children are raped in the production of

21   these horrific videos and that the continued circulation of those

22   depictions reaps significant additional harm on those defendants–

23   on those, on those victims.

24         One of the other– we get this argument oftentimes, and I'm

25   sure your Honor has heard it: well, he didn't touch anybody or he

1     didn't hurt anybody himself. And one of the things that concerns

2     the United States most about the kind of activity that Mr. Fout was

3     engaged in is, it normalizes this type of behavior in the community

4     of child pornographers, of pedophiles, and creates a further

5     demand for victimization, new videos, new pictures, new rapes of

6     children. And we can't lose sight of that fact, we can't lose sight of

7     the serious nature of the offense that the Defendant is here before

8     today, before the Court today.

9          A couple things that the Court has already touched on, of

10    course, are the Defendant's characteristics, and while the United

11    States would recognize that he has health problems and has had

12    some terrible events in his own history, there are things that swing

13    the gate the other way significantly, your Honor.

14         One of them is that, who better than Steven Fout could know

15    the effects, the devastating effects, of being molested as a child,

16    and he should have known better. Also, your Honor, as the Court

17    noted, the chats in which the Defendant has engaged are reflective

18    of his character.

19         Not only was he seeking child pornography; he was actually

20    coaching other individuals who he believed to be either pedophiles

21    or children themselves on how to commit rapes of children,

22    including advising them to drug individuals so they could take

23    advantage of them. Those kinds of things, your Honor, in my mind,

24    swing the gate the other way.

25         While there are characteristics that weigh in the favor of the

1    Defendant, there are certainly a number of 3553(a) factors that

2    weigh heavily against him, and I ask that the Court consider those

3    in making its decision today.

4                MR. HUTSON:  Your Honor, if I may briefly respond?

5                THE COURT:   Yes, sir. Certainly.

6                MR. HUTSON:   Thank you very much. Your Honor, of

7    course, Steven is here because Steven committed an offense. The

8    computer issue is related to the statute. The computer was the

9    mechanism in which these crimes occurred.

10       And many courts in the Sixth Circuit and beyond have

11   determined that, when a court gives a sentence, whether it be

12   related to special conditions or the sentence itself, that the

13   sentence has to be narrowly tailored to fit the individual defendant.

14       With that being said, your Honor, we do believe that strict

15   prohibition on the computer and the Internet would provide safety

16   to the community, and it would promote respect for the law and it

17   would prevent Steven from re-offending.

18       I would also say– and I have a great deal of respect for Mr.

19   Morris. He's one of the finest prosecutors in their office. But I do

20   respectfully disagree with his argument related to the person

21   running the sex offender facility at the Bureau of Prisons facility.

22       I disagree, because I would find it shocking that someone

23   who is employed by a federal facility would confess that inmates

24   have been abused, which could subject that facility to criminal

25   and/or civil liability. So I'm not sure that that is the most reliable

1    source of whether inmates are being abused or not.

2           And, lastly, your Honor, in terms of Mr. Morris' argument

3    about this could normalize this type of behavior, it's not Steven

4    that has characterized Internet conduct as passive versus active

5    conduct you see in an enticement case. That's courts. Courts'

6    decisions have classified Internet conduct as a passive crime in

7    relation to other types of sex offenses.

8           And so the rationale behind that is, is, again, back to the

9    sentencing statute, that it is the individualized defendant that

10   receives a sentence in a case, not a group of criminal defendants

11   and a type of conduct that they might commit that is similar to one

12   another.

13          Your Honor, and just for purposes of the record, we again

14   object to the chat discussions as being a basis for a decision with

15   the Court today. Steven is here for a child pornography sentence

16   today, and we certainly do not stipulate to any, any of those actions

17   in relation to any other allegations in the pre-sentence report.

18   Steven does again object to those allegations as well. Thank you.

19          THE COURT:   I'm going to address the departure issue

20   initially, because I would typically wait until after I've heard from

21   everyone in allocution, including the Defendant, before addressing

22   issues of variance. Because it really does get to the point of all the

23   factors in 3553.

24          Now, some of these, of course, have been argued in support of

25   a variance as well, but initially I do need to address the issue of a

departure under the guidelines, because that affects the guideline

calculation.

   And the Defendant has raised several arguments in support of

a downward departure. We began the discussion today by my

referencing Section 5K2.0, which indicates that the Court has

limited discretion in terms of departures. Departures that can be

considered are those that are outlined in 5K2.0. Some are

excluded– some are incorporated 5H factors and others are

excluded.

   But the section basically provides that, unless it's stated in

5K, then it shouldn't be the basis for a departure. And I have

referenced 5K2.22, so let me turn to that. There's also been an

argument of this case being outside the heartland of cases, which

would be 5K2.0.

   But we'll get to 5K2.22 first, and that section provides, in

essence, that, "Age may be a reason to depart downward only if and

to the extent permitted by 5H1.1." And then Subsection 2–

Subparagraph (2) provides, "An extraordinary physical impairment

may be a reason to depart downward only if and to the extent

permitted by Section 5H1.4." So we have to turn to those two

sections.

   5H1.1 indicates that, "Age, including youth, may be relevant

in determining whether a departure is warranted if considerations

based on age, individually or in combination with other offender

characteristics, are present to an unusual degree and distinguish

1    the case from the typical cases covered by the guidelines."

2        Now, initially, if I look at age without these other factors, that

3    is not a reason to depart in a case such as this. Unfortunately, too

4    many of these cases involve very young defendants. My experience

5    has been that I see defendants that are college-age male or they are

6    over-50-aged male. That's just the characteristics of those

7    individuals.

8        So, and like I say, I've sentenced way too many 20- to 25-

9    year-olds for possession and distribution of child pornography. So

10   age in itself, in my experience, would not be a reason to depart,

11   under 5K– I'm sorry– 5H1.1.

12       And even if I look outside my own experience, I look at other

13   individuals that are often charged and convicted under the statute

14   that we're talking about here today, it's not unusual to see young

15   defendants of the age of Mr. Fout. However, the Court can also

16   consider age in combination with other factors.

17       When I look at the next section, 5H1.4, that section provides:

18   "Physical condition or appearance, including physique, may be

19   relevant in determining whether a departure is warranted, if the

20   condition or appearance individually or in combination with other

21   offender characteristics is present to an unusual degree and

22   distinguishes the case from the typical cases covered by the

23   guidelines. An extraordinary physical impairment may be a reason

24   to depart; for example, in cases of a seriously infirm defendant,

25   home detention may be as effective as, and less costly than,

1   imprisonment."

2        The argument that's been made here is that the combination of

3   the Defendant's physical characteristics, including his

4   impairments, would be a reason for the Court to consider a

5   departure. Again, in my experience, it's not unusual to have a

6   lower functioning individual who appears before the Court for

7   sentencing. That tends to be the rule rather than the exception.

8        However, it is unusual for the Court to have an individual

9   that's legally blind that has been convicted of these particular

10  offenses. But, again, this defendant was able to function and was

11  able to commit the offenses under the same conditions that he

12  presents today. But the question becomes, would those

13  characteristics be a reason to depart, are they so extraordinary that

14  they would be a reason to depart?

15       The Bureau of Prisons certainly does have facilities that can

16  provide medical treatment for the Defendant's conditions, also not

17  only the conditions that have been mentioned, specifically, issue

18  being legally blind, but the other conditions as well. He can be

19  treated in a medical facility, and there are those facilities that can

20  address those problems that he has, that can provide him with

21  necessary evaluation as well as treatment.

22       But the argument is that, based upon these specific

23  characteristics, the Defendant would be more prone to be injured

24  either by accident or intentionally injured. To base a decision on

25  that argument would be speculation by the Court, pure speculation.

1    And while the Court certainly has sympathy for individuals,

2    the Court should not base its decision on sympathy and use this as

3    an excuse to do so. So, in this particular case, I do not believe that

4    the characteristics would be of the nature that would give rise or

5    should give rise to a departure under 5H1.4. Likewise, I do not

6    believe that the conditions are sufficient that would fall outside the

7    heartland of cases.

8        When the Court looks at, again, looks at the typical offender

9    in these cases, it's not always the strong, the six-foot-two or six-

10   foot-three, 250-pound, defendant that presents to the Court, but

11   it's individuals that sometimes are of a slighter build and may be

12   more prone perhaps to be abused.

13       But, quite frankly, the Bureau of Prisons has a variety of

14   individuals that are much smaller and that are much more frail than

15   this defendant. Unfortunately, I've had to sentence quite a few that

16   have very serious medical conditions, and, again, the Bureau of

17   Prisons is able to address those individuals.

18       So while the Court certainly considers these arguments

19   individually, as well as in combination, under those sections that

20   have been referenced, 5K2.22, 5K1.– I'm sorry– 5H1.1, 5H1.4,

21   5K2.0, which is the section that allows the Court to consider

22   matters that are outside the heartland, it would not appear to me,

23   based upon the information that has been presented, that a

24   departure would be appropriate.

25       Now, once again, the Court is making the determination under

1    the guidelines, and this same information is relevant as an issue of

2    a variance, when the Court considers these issues under 3553. But

3    in terms of a departure, those would not be reasons to depart.

4        Likewise, there has been an argument that the Court should

5    consider an omnibus departure based upon the assertion that the

6    guidelines are just too harsh. As you can tell from my questions, in

7    this court, in the federal system, individuals are often presented

8    with a number of very aggravating circumstances, and that would

9    appear to be the situation here.

10       And just because the Court can depart doesn't mean that the

11   Court always should depart. While the Court has the ability to do

12   so, it should do so when appropriate, and, in my view, a departure

13   would not be appropriate under the circumstances that have been

14   presented and the reasons that have been argued for a departure

15   under the motion and the memorandum that has been filed by the

16   Defendant. So the motion for departure will be overruled at this

17   time.

18       I'll also note for the record that there has been a late objection

19   that has been made to the Court considering the Internet chat, and

20   I'm going to exclude that from my consideration in determining the

21   penalty to be imposed in the case. My point earlier was that, if this

22   was the Defendant engaging in this chat, that his functioning level

23   was higher than the functioning level that was being represented,

24   that he was very low-functioning. It appears to the Court that he is

25   able to function at a higher level than has been represented to the

1  Court.

2      So the motion for downward departure will be overruled for

3  the reasons stated, and we'll proceed at this time with allocution.

4  I'll certainly consider all the arguments that have been made

5  previously, but I will give the parties an opportunity for full

6  allocution, and that would include giving the Defendant the

7  opportunity to make a statement to the Court.

8      So, Mr. Hutson, at this time, if you have additional

9  information, I'll certainly consider it, and I'll also consider any

10  statement that Mr. Fout would like to make.

11      MR. HUTSON:  I believe Mr. Fout would like to make a

12  brief statement. Would the Court prefer him to stay seated?

13      THE COURT:  He can remain at counsel table, if the

14  reporter is able to hear him from there. Also, before he makes a

15  statement to the Court, let me also remind Mr. Morris, if you have

16  any victim impact statements that you would like to present to the

17  Court, you can certainly do that during allocution here in just a

18  moment.

19      Thank you, and you may proceed.

20      MR. FOUT:  I'd like to say I'm very sorry. This will

21  never happen again.

22      THE COURT:  Anything else, Mr. Fout?

23      MR. FOUT:  No, sir.

24      THE COURT:  All right. Thank you. Mr. Hutson, any

25  other statements you would like to offer during allocution?

1          MR. HUTSON:  No, your Honor. Thank you.

2          THE COURT:   All right. I have reviewed all of the

3    materials attached, of course, to the memorandum that was filed in

4    your case. I know that there were quite a few matters that weren't

5    referenced, but I certainly reviewed all of those matters as well.

6    Thank you. Mr. Morris?

7          MR. MORRIS:  Your Honor, it was my understanding, it

8    was my understanding, that the victim impact statements in this

9    case would be made available to the Court. I, unfortunately, don't

10   have hard copies of them to submit to the Court at this time, I don't

11   believe.

12        I can go through my file and see if I have them, but they have

13   been received in this case. They generally detail certain of the

14   victims that were identified from the child pornography that the

15   Defendant was found to be in possession of, and they generally do

16   report, as the Court is aware in these cases, the ongoing

17   devastating effects that not only the initial abuse or predation on

18   them caused, but the repeated effects that these children, some of

19   whom are now adults, continue to suffer as a result of their images

20   being circulated and looked at over and over again.

21        Your Honor, again, I apologize for not having the hard copies

22   here, but as I understand it, the Court has– those have been made

23   available to your Honor.

24        THE COURT:   I believe I am required, during

25   allocution, to ask if you have any statements, and actually any

1    victim is allowed to make a statement as well, not only in written

2    form, but to present themselves to the Court.

3              MR. MORRIS:   Yes, your Honor.

4              THE COURT:   So I'm fulfilling that responsibility.

5              MR. MORRIS:   There are no victims, your Honor, that

6    have come forward and said that they would like to be heard at the

7    hearing today.

8              THE COURT:   All right.  Thank you. Well, again, the

9    Court not only considers the information previously provided, but

10   the Court will certainly consider the Defendant's statement, his

11   statement that this type of an offense will not occur in the future.

12        The Court considers not only the guidelines, but also relevant

13   factors of Title 18, Section 3553. Many times, while information

14   that is presented as a departure would not be appropriate to change

15   the guideline calculation, it certainly can affect the Court in terms

16   of a variance. And if it doesn't support a variance either above or

17   below the guidelines, it is helpful to the Court in determining

18   where within a guideline range a particular individual should be

19   sentenced.

20        Again, the guidelines are not binding. There is a mandatory

21   minimum as to one of the counts in this case of 60 months, but the

22   guideline range in this particular case is higher than that. I'll

23   review the guideline calculations here in just a moment.

24        But before I do review the guideline calculations, I do want to

25   mention that the factors that the Court would consider under 3553

1    would include the nature and circumstances of the offense, as well

2    as the history and the characteristics of the Defendant. Many of

3    those characteristics have been addressed here today.

4          The Court will also consider the need for the sentence to

5    reflect the seriousness of the offense, the need to promote respect

6    for the law and provide a just punishment for the offense. The

7    Court will also consider the issue of deterrence. It's important in

8    every case, it's certainly important in this case, as is the issue of

9    protection of the public.

10         The Court also considers the other relevant factors of 3553,

11   including the need to avoid unwarranted sentencing disparities

12   among defendants that are similarly situated who have been found

13   guilty of similar conduct.

14         But as the attorneys are certainly aware, it's difficult to find

15   defendants that are similarly situated because, as Mr. Hutson has

16   indicated, sentencing is unique, and the Court must consider the

17   individual factors that a defendant has in imposing a sentence.

18         In this particular case, there are no objections to the report.

19   We've discussed the issues of departures. There's been no

20   objections to the report, except as I've indicated with regard to the

21   Internet chat. Those are actually attached, I believe, to the United

22   States' response to the Defendant's motion.

23         But I will adopt the findings that are contained in the pre-

24   sentence report, as well as the following guideline calculations.

25   They do appear in the pre-sentence report, beginning at Paragraph

1  17, which indicates that the 2013 edition of the guideline manual

2  has been used.

3       In this particular case, the base offense level is a Level 22, but

4  as we've been discussing, there are a number of enhancements, and

5  I do need to mention the reason for these enhancements.

6       There is a two-level enhancement because the material that

7  was possessed involved prepubescent minors or a minor under the

8  age of 12, and that results in a two-level increase. There's also a

9  two-level increase under Paragraph 21. The paragraph indicates

10 that the agent in the case was able to download 105 images of child

11 pornography from the Defendant's computer using a file-sharing

12 program.

13      And there's a four-level increase because the material that

14 was portrayed– or that was possessed portrayed sadistic and

15 masochistic conduct, depictions of violence, involving very young

16 children.

17      There's also the two-level increase for use of the computer

18 and a five-level increase based upon the number of images. In this

19 case, more than 600 images were involved. And that results in an

20 adjusted offense level of Level 37.

21      There's a three-level reduction shown for acceptance of

22 responsibility. Before the Court can award the third level of

23 acceptance credit, it requires a motion from the United States.

24          MR. MORRIS:   Your Honor, we would so move at this

25 time.

1       THE COURT:  And I'll sustain that motion. That has the

2   effect of reducing the total offense level to a Level 34. Now, in this

3   particular case, Mr. Fouts [sic] does not have any criminal history,

4   and that's not unusual in cases such as this. It's not unusual to have

5   a person who appears for sentencing that does not have any prior

6   convictions, and so he is placed in criminal history category of

7   one.

8       His guideline range, based upon those calculations, would be

9   a range of 151 to 188 months, and that range is set forth in

10  Paragraph 58. The fine range in the case is a range of 17,500 to

11  $175,000. Now, in this particular matter, the parties have agreed

12  upon an amount of restitution. Based upon that, I will advise the

13  parties I'm not inclined to impose a fine in this particular case. But

14  that is the fine range.

15      And I'll also note for the record that the probation office has

16  advised the parties of the standard conditions of supervised release

17  through the pre-sentence report, and the parties are in agreement

18  and have not objected to any of those conditions to be imposed on

19  supervision.

20      I will advise the parties that I will make a minor change in one

21  of the revisions based upon some case law from the Sixth Circuit,

22  the Arnold case, that indicates that the Court should perhaps

23  consider some limiting language on one of those conditions, and

24  I'll address that here in just a moment.

25      But I will also note for the record that, in considering the

1    issues of supervised release, that I have reviewed quite a few cases

2    from the Sixth Circuit. We've referenced some of those today, and

3    I'll be addressing, although there's no objection, I'll be addressing

4    some of those conditions in a little more detail in just a moment.

5          Again, those are the guideline calculations that the Court has

6    adopted. So, in addition to the guidelines, in addition to the factors

7    of 3553, the Court will also consider statements that are made in

8    allocution.

9          In this particular case, while I have certainly considered the

10   arguments that do support a variance, I am convinced by the

11   arguments that have been made by the United States in the case that

12   a variance would not be appropriate under the facts that are

13   presented. And there are several points from their sentencing

14   memorandum that I specifically agree with, and I do want to note

15   for the record, as a basis for my ruling.

16         First, as the Government points out, that while the Defendant

17   does have visual impairment, he's legally blind, it was not so

18   severe that would prevent him from or that did prevent him from

19   distributing child pornography through the Internet and perhaps

20   participating in Internet chats.

21         Again, there's been an objection to the Internet chats, but,

22   again, there's also no objection to the issue of distribution and that

23   he was able to do so, in light of his visual impairment.

24         Second, the child pornography images are extremely serious,

25   and they do result in perpetual harm to the victims. That's certainly

1   clear. And this type of an offense does– it tends to validate, in the

2   minds of the offender, that the sexual exploitation of children is

3   normal as opposed to the product of what can only be described as

4   sick and twisted.

5        It's also true that as this normalization process takes place

6   with various offenders, that sexual exploitation of children only

7   increases, and the children are becoming younger in these cases

8   that we see.

9        Next, it is hard to imagine a more serious class of

10  pornography of children than what's been described in the pre-

11  sentence report. It's depravity that just shocks the conscience of

12  the Court.

13       Now, there has been a challenge to the guidelines. I've

14  discussed that earlier, but I will again refer the parties to my belief

15  that these issues have been addressed by the Sixth Circuit in recent

16  decisions by Judge Kethledge and the cases that have been cited.

17       Also, it's clear to the Court that Mr. Fout has demonstrated an

18  interest in engaging in sexual activities with very small children,

19  and that certainly does cause the Court some concern. But some of

20  that concern can be alleviated through conditions of supervised

21  release that will be imposed and conditions that have been adopted

22  in this district in such cases.

23       There has been some discussion about whether home

24  detention would be an appropriate remedy here, but as indicated in

25  my questions earlier, at the time these offenses occurred, the

1    family was not able to either detect the offenses or prevent them

2    from taking place.

3         And while the Defendant has expressed some remorse in this

4    case and he's indicated that this action will not happen again, he's

5    indicated that he is certainly sorry for his actions, I believe that

6    he's failed to recognize the pain and the harm, the damage, that's

7    been caused by his actions in possessing and distributing child

8    pornography.

9         I have referenced an article earlier that I believe really

10   specifically addresses this issue of who the real victim is and the

11   ongoing nature of the harm that it causes when individuals

12   download child pornography.

13        So, considering all those arguments and that information, the

14   Court believes that, under the circumstances, that the aggravating

15   factors would certainly offset any mitigating factors in terms of a

16   departure– I'm sorry– in terms of a variance from the guidelines.

17        However, I do believe that the arguments that have been made

18   for mitigation would support a sentence at the bottom of the

19   guideline range. I don't believe it's necessary for the Court to go

20   above that to meet all of the statutory factors, including the issues

21   of deterrence and protection of the public.

22        I believe that such a sentence would certainly reflect the

23   seriousness of the offense, I believe it would also promote respect

24   for the law, and it would be a just punishment, in light of the

25   egregious nature of the pornography that I've mentioned several

1    times now.

2              MR. MORRIS:  Your Honor, I apologize. It's highly

3    unusual for me to interrupt the Court at this point in a sentencing

4    hearing, but I would like to have some clarification here on what's

5    going on with regard to the previously objected to Internet chat

6    issue.

7         The PSR, in Paragraph 12, discusses how the Defendant was

8    investigated for participating in chat rooms on the Internet. He

9    allegedly was telling other individuals they could molest a child,

10   for instance, by putting Visine in the child's drink so that the child

11   would fall asleep and could then be molested.

12        Defendant also talked about following the child into the

13   bathroom at a restaurant. Defendant Fout told the investigating FBI

14   agent that it was– his fantasy was to have sex with a newborn.

15        What I'm not clear about is, is the Defendant objecting to that

16   conduct being attributed to him, because if it is, your Honor, I'm

17   prepared to call an FBI agent to explain why that should be

18   attributed to him.

19             THE COURT:  Well, we'll certainly attempt to get that

20   clarified. It was my understanding that there was no objection to

21   the pre-sentence report, that further information that supports your

22   position was attached to your sentencing memorandum.

23        The Defendant now objects to– he objected to the conduct

24   being attributed to him. I had addressed the issue earlier, in

25   response to what I perceived to be his argument that he was low-

1   functioning. Because it would appear to me that if those

2   communications were, in fact, his communications, that he's not

3   low-functioning. He's able to communicate at a much higher level

4   than the argument that was being made.

5       But I'll certainly allow Mr. Hutson to state his objection, if

6   you would like to object, and if we do need to take– if you would

7   like to present any further proof on that, I'll certainly allow you to

8   do that. I don't intend to go back over the matters that I've covered

9   to this point in the proceeding, but we'll see where we go after I've

10  heard from Mr. Hutson.

11      Mr. Hutson, what is the position of the Defendant?

12          MR. HUTSON:   Well, your Honor, the pre-sentence

13  report properly classifies these occasions as allegations. We are

14  aware of the allegations. We were made aware of the allegations

15  early on in the case.

16      From our perspective, there is nothing to object to. It would

17  be like a defendant who had a pending arrest, that is a fact, that the

18  defendant has a pending arrest. It's an allegation that the defendant

19  has created– or committed a bank robbery. And so, from my

20  perspective, I did consult probation about this issue at some point

21  in time, that I did not have an objection to the report as long as it

22  was presented as an allegation.

23      That's all we have to this point. I'm not necessarily

24  contesting the issues that Mr. Morris is speaking about today. But

25  from my reading of the report, it says they're allegations, and

1    there's nothing to object to, if that's how the information is

2    presented.

3           THE COURT:  I will advise the parties that I'm not sure

4    that presenting proof would alter my analysis in terms of the

5    sentence. And because the parties have not indicated any objection

6    to conditions of supervised release– and that really is what this

7    goes to, is an issue of providing protection to the public going

8    forward– because they haven't objected to that, you haven't

9    objected to it, either side, then it probably would not affect my

10   determination as to conditions of supervised release.

11       But if you would like to present evidence, you're certainly

12   allowed to do that. I'll let you develop the record if you feel it's

13   necessary.

14          MR. MORRIS:  Well, your Honor, what I would do at

15   this time is proffer to the Court that those chats were attributed to

16   the Defendant, because the undercover investigation looked at the

17   IP address and they issued subpoenas to those IP address holders,

18   and those came back to Defendant's residence.

19       I would proffer that to the Court. I don't know if Mr. Hutson

20   has an objection to that, but that's my proffer to the Court to

21   support why those allegations are in the pre-sentence report.

22          THE COURT:  All right. Mr. Hutson, do you

23   acknowledge that that would be the appropriate IP address?

24          MR. HUTSON:  Your Honor, as I mentioned earlier

25   during argument, I'm not prepared to stipulate to any criminal

1    conduct outside of what we're here for today. I can tell you, it is

2    part of the Government's exhibits and may be a different time

3    frame, but it is also clear that there were other individuals using

4    wireless Internet around the residence at some point in time.

5         So I think it might be inappropriate for me to stipulate to

6    information that could corroborate another criminal offense

7    against my client, so I would have to object to it in that regard.

8                    THE COURT:  All right. That's fine. If you would like

9    to present the witness to confirm that information, I'll certainly

10   allow you to do that.

11                   MR. MORRIS:  Your Honor, in that case, the United

12   States would call Special Agent Richard Lara.

13                   THE COURT: Thank you. Again, I'll note for the record

14   that this would be an issue that would not affect the guideline

15   calculations, so it necessarily would not require a finding by the

16   Court. But I'll certainly consider the information for whatever it's

17   worth.

18                   COURTROOM DEPUTY:  Do you solemnly swear or

19   affirm that the testimony you will give in the matter before the

20   Court today will be the truth, the whole truth, and nothing but the

21   truth, so help you God; if so, please say, "I do"?

22                   THE WITNESS:   I do.

23                   THE COURT:   Thank you, and you can proceed.

24                        **DIRECT EXAMINATION**

25   by Mr. Morris:

1    Q.    Special Agent Lara, you and I met before the sentencing

2    hearing today, correct?

3    A.    Correct.

4    Q.    And I showed you–

5          (Court reporter requested witness name.)

6          THE WITNESS:  Oh, Richard, R-i-c-h-a-r-d; last name,

7    Lara, L-a-r-a.

8    Q.    And during our meeting, I showed you three FBI reports of

9    investigation which contained excerpts of chats that have been part

10   of the case file in this case, correct?

11   A.    Correct.

12   Q.    And based upon your familiarity with the investigation, were

13   those– why should those discussions that were contained in the

14   United States' attachments to the Defendant's motion for a

15   downward departure, why are those attributable to the Defendant?

16   A.    They, during those discussions, those undercover sessions, a

17   protocol analyzer was used that was able to, during those

18   downloads, able to analyze the connection.  And since those files

19   were downloaded directly from that individual, we were able to

20   trace an IP address that was used to bring those– that was for that

21   connection.

22         Through subpoenas for those IP addresses, we were able to

23   the get further information as to who the subscriber was relating to

24   those IP addresses on that date and at that time.

25   Q.    And what were, based on those subpoenas, what– to where

1    were those IP addresses attributable?

2    A.      According to Charter V– Internet service was with Charter,

3    and the address was 157 Limestone Drive, Sweetwater, Tennessee.

4    Q.      And based upon your familiarity with this case, is that where

5    the Defendant was residing at the time of these chats?

6    A.      Yes, it is.

7            MR. MORRIS:   Those are all the questions I have for

8    Special Agent Lara, your Honor.

9            THE COURT:   Thank you. Any cross-examination?

10           MR. HUTSON:   Very briefly, your Honor.

11                          **CROSS-EXAMINATION**

12   by Mr. Hutson:

13   Q.    Are you also familiar with reports in this case that indicate

14   that perhaps at least one other individual was using the WIFI

15   connection from this location at some point in time?

16   A.    Yes. I have mentioned in one of the reports that the wireless

17   network might have been left open, and there was a neighbor at one

18   point that possibly parked in front of the house and used the

19   wireless system.

20   Q.    So while the Internet protocol analyzer may be a good source

21   of information, there's no real way for you to tell the Court today

22   that Steven Fout, or whoever was at the residence, was the actual

23   person in front of the computer; is that an accurate statement?

24   A.    If you take into account the undercover sessions of what was

25   relayed and some of the facts or some of the things that the other

1    person mentioned, in my opinion, I would say they were

2    attributable to Steven.

3    Q.    But, given your experience, this IP address is associated with

4    an address, correct?

5    A.    Correct.

6    Q.    It's not associated with a person?

7    A.    You are correct.

8    Q.    And there is no two-way camera system on the computer for

9    you to be able to tell the Court today, 100 per cent, this is Steven

10   Fout on the other end?

11   A.    Correct.

12           MR. HUTSON:  Thank you. No further questions.

13           THE COURT:   Special Agent, did you conduct any type

14   of investigation to rule out this other person–

15           THE WITNESS:   No, I did not, sir.

16           THE COURT:   –in your case? Did you feel like there

17   was any reason to do so?

18           THE WITNESS:   No, sir.

19           THE COURT:   Thank you. Anything else?

20           MR. MORRIS:   No, your Honor.

21           THE COURT:   Thank you. You can step down.

22       (Witness excused.)

23           THE COURT:  All right. Thank you. Any further

24   information you would like to present?

25           MR. MORRIS:   No, your Honor. I apologize for sort of

1    taking things out of order, but I wanted to cover that with the

2    Court.

3            THE COURT: All right. Thank you. Let me just note for

4    the record that the additional information provided, the Court

5    analyzes information that's offered during a sentencing hearing

6    under a different standard than the Rules of Evidence would

7    provide; that as long as the information has sufficient indicia of

8    reliability, the Court can consider the information.

9        In this particular case, I do find that the information

10   presented would have that level of reliability, but the Court only

11   considers the information for the reason that I've stated earlier,

12   and that is whether the Defendant had the level of sophistication

13   has been described or whether he was lower functioning than

14   indicated.

15       Throughout the course of this proceeding it's been my

16   determination that, while he may not be a very high-level–high-

17   functioning individual, he's not at the level that has been described

18   or has been argued earlier and certainly would be able to engage in

19   the type of chat that has been referenced.

20           Again, the issue, however, goes to the issue of protection of

21   the public. It does not alter my analysis in terms of the length of

22   incarceration that would be imposed. Again, the parties are in

23   agreement in terms of conditions of supervised release, and so,

24   again, it would not affect the ultimate sentence in the case. But

25   that's the manner in which the information is being considered by

1   the Court.

2       Now, I was discussing the various factors that the Court

3   considers. I've gone through the 3553 factors several times at this

4   point. I was mentioning the fact that the Court considers the issue

5   of unwarranted sentencing disparities and the need to consider

6   each person individually.

7       And, again, as has been argued by Mr. Hutson, the Court's

8   duty when considering all these issues, is to impose a sentence that

9   would be sufficient, but not greater than necessary, to comply with

10  the purposes of Title 18, Section 3553(a)(2).

11      So, with all that background, all of that information, when

12  I've considered all the factors that I have just listed, it's my

13  determination that, in this particular case, that a sentence at the

14  bottom of the guidelines would be the appropriate sentence in this

15  particular case in terms of a term of incarceration.

16      Now, there's also a very important issue, and that is, in

17  addition to the term of incarceration, what's an appropriate period

18  of supervised release.

19      In this matter, when the Court takes into account the term that

20  the Defendant will likely serve, his age at the time that he would be

21  released, and how much supervision would be the minimum period

22  at that time, it's my determination that a term of supervised release

23  to provide sufficient protection to the public would be 30 years. So

24  that would be the term of supervision that will be imposed in the

25  case, and, again, that would be the minimum term that I believe

1   would be appropriate.

2          Also, when the Court considers conditions of supervised

3   release, I'll refer the parties back to United States vs. Shultz. I

4   believe that was the case I mentioned earlier by Judge Sutton, when

5   he talks about conditions of supervision.

6          And, of course, there are three primary reasons for imposing

7   these conditions, and they do include to deter future criminal

8   activity, to protect the public, and to provide proper rehabilitation

9   for the Defendant.

10         Judge Sutton also notes in that opinion that the conditions of

11  supervised release must be reasonably related to the various

12  sentencing factors, and I've already discussed those factors. But

13  they do include the nature of the offense and the characteristics of

14  the Defendant.

15         Judge Sutton also makes a very important point in that case,

16  and that is that sex offenders don't get a free pass at child

17  molestation before prophylactic rules of supervision become

18  appropriate. And, in my opinion, the conditions that have been

19  adopted in this district for these offenses are all important and they

20  all do provide sufficient protection of the public if they are

21  followed.

22         There is one modification to Local Rule– let's see–

23  83.10(b)(5) that references possessing printed photographs,

24  paintings, recorded materials or electronically produced materials.

25  There's a prohibition on that for the use of deviant sexual arousal,

1    and that will be modified to reflect arousal of sexual interest in

2    children.

3        I believe that comes from the <u>Arnold</u> case, if I'm not

4    mistaken. So there will be that modification. I had mentioned that

5    earlier. I do think that that would be an appropriate modification.

6        Also, before I fully announce the sentence, with regard to

7    another condition of supervised release, and that is Local Rule

8    83.10(b)(11), that relates to the use of a computer, in this case, I

9    believe it's very important that the Defendant not have access to a

10   computer with access to the Internet.

11       While he may be able to use a computer at some point, he's

12   not being precluded from using a computer, he will not be allowed

13   the Internet access in any means, in any manner. That's the– that

14   led to the problems in this particular case. And in order to provide

15   sufficient protection to the public and also to prevent further

16   offenses by the Defendant, I do believe that that restriction is

17   absolutely necessary.

18       Now, having given you my reasons for the sentence, I will

19   announce it at this time. And, again, I've considered the nature and

20   the circumstances of the offense, as well as the history and

21   characteristics of the Defendant, the Advisory Guideline Range, as

22   well as the other factors that are listed in 3553(a).

23       It will be the sentence of the Court, pursuant to the

24   Sentencing Reform Act of 1984, as modified by the decisions in

25   <u>Booker</u> and <u>FanFan</u>, it will be the judgment of the Court, as to

1    Counts One and Two of the superseding indictment, that the

2    Defendant, Steven Marshall Fout, will be committed to the custody

3    of the Bureau of Prisons for 151 months.

4         Now, those will be served concurrently, so it will be a term of

5    151 months as to each of Counts One and Two, again, to be served

6    concurrently. And it's the determination of the Court that such a

7    sentence would provide adequate deterrence and also provide just

8    punishment for the offense in this particular case.

9         The Court will also recommend that Mr. Fouts [sic]

10   participate in sex offender treatment while incarcerated at the

11   Bureau of Prisons, but I'm also going to recommend, as a primary

12   recommendation, that he receive any and all necessary medical

13   treatment during the period of incarceration based upon the

14   arguments that have been made earlier.

15        So my first recommendation will be medical care and

16   treatment, proper assessment and all necessary treatment;

17   secondarily, will be participation in the sex offender treatment

18   program.

19        He will be required to make restitution in the amount of

20   $2,500 to the victims that are identified in the pre-sentence report

21   and also that are referenced– I believe the amount was referenced

22   in the parties' plea agreement, and that will be ordered to be paid

23   immediately.

24        Any payment that's not a payment in full will be divided

25   proportionately among the individuals identified. And the

1    Government may enforce the full amount of restitution ordered at

2    any time pursuant to Title 18 Sections 3612 and 3613 and 3664(n).

3            The United States Bureau of Prisons, the United States

4    Probation Office and the United States Attorney's Office may and

5    shall monitor the payment of restitution and reassess and report to

6    the Court any material change in the Defendant's ability to pay that

7    amount.

8            He will be required to make restitution payments from any

9    wages that he earns in prison in accordance with the Bureau of

10   Prisons Inmate Financial Responsibility Program. Any portion of

11   the restitution that's not paid in full at the time of release shall

12   become a condition of supervision.

13           However, I do believe that Mr. Fouts [sic] does not have the

14   ability to pay interest on the restitution ordered, and, therefore, it

15   will be waived in the case.

16           Now, as I've explained earlier, upon release, Mr. Fout will be

17   placed on supervised release for a term of 30 years as to each of

18   Counts One and Two, to be served concurrently.

19           And within 72 hours of release from the custody of the Bureau

20   of Prisons he shall report in person to the probation office in the

21   district in which he is released. Again, the Court imposes this term

22   as the minimum term that is necessary to provide sufficient

23   protection of the public.

24           While on supervised release, the Defendant shall not commit

25   another federal, state, or local crime, shall comply with the

1    standard conditions that have been adopted by this court in Local

2    Rule 83.10, and he may not possess, of course, a controlled

3    substance illegally.

4         He may not possess a firearm, destructive device, or other

5    dangerous weapon, and must cooperate in the collection of DNA as

6    directed by the probation office. And he will be required to comply

7    with the following special conditions.

8         First, he will be required to participate in a program of sex

9    offender mental health treatment at his own expense, as approved

10   by the probation office, until such time as he's released from the

11   program by the probation officer.

12        He must comply with the policies and procedures of the

13   treatment program, and he shall waive all rights to confidentiality

14   regarding sex offender mental health treatment in order to allow

15   release of information to the United States Probation Office and to

16   authorize open communication between the probation office and

17   the treatment providers, and that is pursuant to Local Rule

18   83.10(b)(1).

19        Next, he may have no direct or third-party contact with any

20   victims in the case by any means available to him, and that's in

21   accordance with Local Rule 83.10, Subsection (b)(2).

22        He may not associate or be alone with children under the age

23   of 18, nor shall he be at any residence where children under 18 are

24   residing without the prior written approval of the probation office.

25   In addition, he may not visit, frequent, or remain at any places

1    where children under the age of 18 normally congregate. That

2    would include public parks, playgrounds, or any businesses that

3    cater to or target children customers.

4          And the Court imposes this condition considering the

5    authority from the Sixth Circuit outlined in <u>United States vs.</u>

6    <u>Arnold</u> that I have mentioned earlier. I do believe that that is a

7    necessary condition, in light of the specific facts of this particular

8    case involving very young children.

9          And for the same reason he may not associate with anyone

10   under any circumstances that he knows to be a sex offender,

11   someone who engages in sexual activity with children under the

12   age of 18, or someone who condones or supports the sexual abuse

13   or exploitation of children under the age of 18, and that would

14   include entities or organizations or groups such as NAMBLA,

15   BoyChat or the BoyLover message board, except while

16   participating in sex offender mental health treatment as approved

17   by the probation office. And that is imposed in accordance with

18   Local Rule 83.10(b)(4).

19         As indicated earlier, he may not possess any printed

20   photographs, paintings, recorded materials or electrically

21   produced material that he may use for the purpose of deviant sexual

22   arousal, but that will be modified to include arousal of sexual

23   interest in children.

24         And, likewise, he may not visit or frequent or remain at

25   anyplace where such material is available to him for the purpose of

1    arousal of sexual interest in children. And that would be modified

2    Local Rule 83.10(b)(5).

3          Next, he shall notify the probation office of any location

4    where he receives mail. He shall not obtain a new mailing address,

5    post office box or use the facility of any business for delivery and

6    receipt of mail or any other correspondence without the approval of

7    the probation office.

8          The Court imposes this condition to, again, to avoid any

9    future violations by the Defendant in accordance with Local Rule

10   83.10(b)(6). And he will be required to submit to a psychosexual

11   assessment at his own expense, as directed by the probation office,

12   and that will be in accordance with Local Rule 83.10(b)(7). And,

13   again, that is for the protection of the public.

14         And, likewise, he shall submit to polygraph testing at his own

15   expense, as directed by the probation office, in order to determine

16   if he is in compliance with the conditions of supervision and also

17   to facilitate sex offender treatment. He must be truthful during any

18   polygraph examination in accordance with Local Rule 83.10(b)(8).

19         All residents and employment must be approved in advance by

20   the probation office, and he may not participate in any volunteer

21   activities requiring unsupervised contact with children under the

22   age of 18 without the approval of the probation office, in

23   accordance with Local Rule 83.10(b)(9).

24         The Court will also impose a search condition, and that is,

25   that he must submit his person, residence, vehicle, or any area over

1    which he exercises control, to a search conducted by the probation

2    office at a reasonable time and in a reasonable manner without

3    prior notice or search warrant in order to determine if he's in

4    compliance with the conditions of supervision.

5        And he must also warn anyone with whom he resides that the

6    premises may be subject to search pursuant to this condition.

7    That's in accordance with Local Rule 83.10(b)(10) and in

8    accordance with Sixth Circuit authority.

9        Likewise, he shall not possess or use a computer or any other

10   electronic device with access to the Internet or to any other online

11   computer service at any location, including employment, but that

12   would be only without the approval of the probation office, and

13   that would be in accordance with Local Rule 83.10(b)(11).

14       And then next, he shall not possess or use any data encryption

15   technique or program designed to conceal material that is illegal or

16   prohibited by the probation office, in accordance with Local Rule

17   83.10(b)(12).

18       He will be required to pay any financial penalty that's

19   imposed by the judgment, and that amount remains unpaid– or, I'm

20   sorry– if any amount remains unpaid at the commencement of the

21   term of supervision, he'll be required to pay on a monthly basis an

22   amount at least ten per cent of his monthly income. And he must

23   provide the probation office with access to any requested financial

24   information.

25       He may not incur any new credit charges or apply for

additional lines of credit without the approval of the probation

office until restitution has been paid in full. He may not enter into

contractual arrangements which obligate funds without the

probation office's approval.

    In accordance with Title 18, Section 3565(b) and 3583(g),

they do require mandatory revocation of probation or supervised

release for the possession of a controlled substance or firearm or

for the refusal to comply with drug testing.

    The Defendant is advised of those requirements of that title,

but in this particular case the Court will not impose mandatory

drug testing as a condition of supervision. It will be suspended

based upon my determination that Mr. Fout does not present a risk

of substance abuse in the future.

    He will be required to pay the special assessment of $200,

which will be due, in addition to the amount of restitution that was

previously ordered. But as announced earlier, he does not have the

ability to pay a fine, and, therefore, the fine requirement will be

waived.

    In accordance with Rule 32(j)(1)(B) of the Federal Rules of

Criminal Procedure, the Court advises Mr. Fout that he has the

right to appeal the sentence imposed in the case. However, a notice

of appeal must be filed within 14 days of entry of the judgment.

Likewise, he's advised that if he requests to appeal, the Clerk of

Court can prepare and file a notice of appeal on his behalf.

    And, likewise, if he does not have the ability to pay the cost of

1    an appeal, he may request permission to proceed in forma pauperis,

2    and he may also request to have counsel appointed to prosecute any

3    appeal on his behalf.

4         The Defendant will be remanded to the custody of the

5    Attorney General pending designation by the Bureau of Prisons.

6         Now, that's a lengthy sentence, lengthy conditions, but at this

7    time let me ask the attorneys three questions. My first standard

8    question is whether there is an objection to the sentence imposed.

9         My second question would be addressing issues of United

10   States vs. Bostic, and that would include objection to any of the

11   proceedings held in the case. Any objections not previously made

12   would need to be made at this time so that they could be addressed

13   by the Court and then properly preserved for review on appeal.

14        My third question is whether the parties would like the Court

15   to make additional findings to support the sentence that has been

16   announced. Mr. Morris, I'll begin with you.

17        MR. MORRIS:   Your Honor, I would answer no to all

18   three of the Court's questions.

19        THE COURT:   All right. Thank you. Mr. Hutson, of

20   course, you made objections earlier to the Court considering the

21   Internet chat information. It's not necessary for you to renew that.

22   That is an objection in the record, the Court considering that

23   information. Any other objections you would like to make?

24        MR. HUTSON:   Yes, your Honor.

25        THE COURT:   All right.  You can proceed then.

1          MR. HUTSON:   Thank you. Your Honor, we do

2    understand the Sixth Circuit <u>Bostic</u> decision. Our position is that

3    that decision does violate equal protection. But given the fact that

4    it is binding precedent, we do renew our objection based on the

5    legal arguments raised in our sentencing memorandum and our

6    motion for downward departure and/or variance.

7          Specifically, your Honor, I have several little notes here that

8    I've tried to jot down as we went today. First, Mr. Fout does

9    believe that this case falls outside the heartland. He is not the

10   typical defendant that is present in a child pornography case.

11         Secondly, your Honor, in terms of the departure analysis, the

12   Court carried out earlier, we do believe Steven is a particularly

13   vulnerable defendant. In terms of the statute itself, your Honor,

14   and his history and characteristics, it's our position that the Court

15   did not sufficiently consider Mr. Fout's medical records and

16   physical attributes and while, at the same time, placing an undue

17   emphasis on other parts of the case that, as of today, are

18   speculation in terms of whether he's low- functioning or not.

19         Steven is, according to the medical records presented by

20   probation in this case, a borderline low-functioning adult male.

21   Those facts are present in the pre-sentence report.

22         Now, I understand that there has been other evidence

23   presented today, and we would object just for purposes of the

24   record that that information has any indicia of reliability to

25   comport with due process. But we do raise that objection and

1  believe that Steven's history and characteristics do warrant a

2  variance in this case.

3        I would also add, your Honor, that we also object in that the

4  nature and circumstances of the offense should warrant a variance

5  as well. This offense occurred in 2009. There has been no evidence

6  presented today that Steven distributed or possessed child

7  pornography in nearly five years. This is a significant part of the

8  case in terms of whether a variance should be warranted.

9        And we do believe that the Court, while we understand that

10  this is a serious offense and Steven has accepted responsibility for

11  violating federal law, at the same time it's our position that the

12  Court may have placed undue emphasis on the seriousness of the

13  offense without examining the time frame that occurred from the

14  fact that the offense occurred in 2009. He wasn't indicted until

15  2010, and here we are today, in 2014.

16        That also relates to deterrence, under the statute. We believe

17  that the significant time frame that has passed does provide a

18  deterrent effect in this case, and we suggest that the Court did not

19  place enough emphasis on those factors, as well, while minimizing

20  some of the other issues that Steven presented to the Court.

21        Also, your Honor, just as a– for purposes of the record, the

22  Court's reliance on Sixth Circuit decision, the <u>Bistline</u> case, et

23  cetera, we do object on those grounds and believe that this case did

24  warrant a downward departure and variance regardless of the

25  higher standard that is currently present with the Sixth Circuit.

1     We make that objection in the event that the law should

2     change or there should be a new case that comes out. We want to

3     make sure that Steven is protected adequately in that regard.

4     Additionally, your Honor, in the pronunciation of the

5     sentence, the Court referenced Steven being involved with minors.

6     We believe that that has not been proven in this case. I do not see–

7     have not seen any evidence that comports with due process.

8     I understand the confrontation clause is somewhat limited in a

9     sentencing proceeding, but we would also raise a confrontation

10    clause objection to that issue as well in terms of how the Court

11    decided the case.

12    Your Honor, also the Court's decision relating to home

13    detention, this also– some of these issues overlap, but in terms of

14    home detention, we reiterate our position that home detention is a

15    viable source of punishment for a defendant.

16    The Court acknowledged that, I believe the Court stated that,

17    there has never been a blind child porn defendant in front of the

18    Court for a case like this, and that is an important aspect of the

19    case. And we believe that home detention could have provided a

20    sentence that is sufficient, but not greater than necessary, to satisfy

21    the combination of the statutory factors required in this case.

22    Additionally, your Honor, the current sentence pronounced by

23    the Court gives Steven a 12-year prison sentence. It is undisputed

24    that he is a blind defendant, a legally blind defendant, who has

25    been subject to abuse. Those records are– were submitted in terms

1   of the pre-sentence report. And we believe that any type of

2   sentence in a Bureau of Prisons facility that exceeds the statutory

3   minimum does, in itself, create a greater risk for a defendant like

4   Steven.

5        I understand Mr. Morris mentioned that there are protections

6   in the facility, but as someone who practices in federal court every

7   day, there are also assaults. And a defendant like Steven will

8   certainly be at a higher risk for injury in both sexual assaults and

9   assaults in general.

10       Lastly– not lastly, your Honor; lastly in terms of this section,

11  we also object to the Court's conclusion that Steven has failed to

12  recognize the damage that he's done in this case. Steven

13  immediately relinquished his computer at the scene in 2009. As far

14  as the evidence that we have in this case, there's no indication that

15  he re-offended by distributing or possessing child pornography.

16       We submit to the Court that that is an indication that this

17  defendant is contrite in what happened in his case, and he does

18  accept responsibility for his actions.

19       In terms of how his allocution may have affected the Court

20  today, Steven, as documented by medical records, is a borderline

21  low-functioning adult male, and those are– that is a classification

22  given by a doctor, not simply a legal argument that an attorney is

23  making for his client.

24       In my interactions with Steven, I certainly have not gotten the

25  opinion that Steven is someone who would be able to carry out a

1    long allocution to determine his contrite nature for his offense in

2    this case. And I just say that for context of the type of defendant

3    that the Court is dealing with.

4          Lastly, your Honor, I realize the Court mentioned the chats

5    and said that the decision was not based upon the chats itself. But

6    the Court has referred to the chats as providing evidence that he is

7    not low-functioning. So, in that regard, in order to preserve the

8    issue, we do object to the sentence being based on that issue.

9          Lastly, your Honor, I do believe that the sentence of the Court

10   today does create a sentencing disparity under the statute, in

11   addition to the 30-year supervised release term. There are several

12   defendants– and we have cited a case in our memorandum– a

13   defendant like Steven, who lives at home, who is cared for by other

14   individuals, who needs assistance, but– and is also functioning at a

15   lower level, the Sixth Circuit case did find that a departure was

16   warranted in that case. And while it is a departure case, the Court

17   did, I believe, use 3553 analysis as well.

18         So, for those reasons, your Honor, we do object to the Court's

19   sentence today. We do want to make sure that Steven's appellate

20   rights are properly preserved, and we appreciate the Court for

21   allowing us make this long objection.

22              THE COURT:   All right. In addition to the long

23   objection, which I will address here in just a moment, would you

24   like the Court to make additional findings?

25              MR. HUTSON:   No, your Honor. Thank you.

1            THE COURT:   All right.  Let me address some of the

2    objections in the case. I do believe that I have adequately covered

3    the issue of the vulnerable defendant in the case and whether he

4    would meet the requirements of falling outside the heartland of

5    cases in Section 5K2.0, as well as the other sections for a

6    departure. Departures, of course, are different than variances, and

7    the Court's also considered these issues as a matter of a variance.

8            Typically, and I believe the attorneys here understand this,

9    typically, my starting point, when we look at the guidelines– and

10   they're not binding– is the middle of the guideline range.

11   Sometimes there are factors that would cause the Court to go above

12   the middle of the range and stay within the range and other times

13   would cause the Court to go below the range.

14           In this case, there are both of those factors; there are

15   mitigating factors and aggravating factors. The Court considers the

16   level of functioning of the Defendant in a couple of ways; one, his

17   proclivity or inclination to commit the offense that he's committed

18   here. Was he more inclined to commit the offense based upon a

19   lower level of functioning, number one; and, number two, does that

20   present an issue of recidivism in the future, going forward. So that

21   really cuts both ways in this particular case.

22           The Court certainly did consider the issue of the medical

23   records that were presented through the pre-sentence report and

24   also the physical attributes of the Defendant. We talked about

25   those quite a bit today, and the issue of whether they would rise to

1    the level of a departure, however, is a separate question.

2          There is no indication in the record that this defendant, that

3    his– although he's legally blind, there's no indication that his level

4    of sight will diminish from what it is now, going forward. He's had

5    this condition for a number of years. He is able to read, with great

6    magnification, at a close distance.

7          While he fits the definition of being legally blind, he is able

8    to see, and he was able to carry out this particular offense in light

9    of his inability or his legal blindness. So the Court certainly

10   considers all of those issues.

11         Quite frankly, the Defendant benefitted from the Court not

12   making a specific finding as to the chats, other than the fact that

13   he's not at the lowest level of functioning. The Court did not

14   consider the gravity of the chats, the specific information that was

15   included, because, if I did, I would be looking at a sentence higher

16   than the bottom of the guideline range.

17         The severity of this offense, the nature of these photographs,

18   ordinarily, would cause the Court to go much above the middle of

19   the guideline range, really more toward the upper end of the range.

20   But those mitigating factors that have been argued as being ignored

21   by the Court were actually used by the Court in imposing a

22   sentence at the bottom of the guideline range.

23         To say that home detention would be appropriate in this case

24   is to ignore the realities of the situation. I think it was Yogi Berra

25   that said, "In theory, there's no difference between practice and

1  theory, but in practice there is." And that's what we have in this

2  particular case.

3         In practice, what happened was, this defendant was able to

4  commit offenses with his physical impairments within his mother's

5  home, with his mother overseeing him to make sure that he didn't

6  do it. So to impose a condition of home detention and say that

7  would be sufficient is just not an appropriate argument under the

8  facts that are presented.

9         Likewise, the time frame does not convince the Court. I

10 believe, if you go back and look at the pre-sentence report, you'll

11 find that this defendant committed these offenses and then engaged

12 in this Internet chat afterwards that we have been talking about

13 here. And while the Internet chat itself– and I've not found that it's

14 a type of a criminal offense, but it's certainly an inclination– or an

15 indication that the Defendant would be inclined to commit offenses

16 if he had the opportunity to do so. So it certainly is relevant to the

17 issue of recidivism in the case.

18        And the Court does find, has found, that this was the author of

19 these chats, this defendant; that it's not likely that someone

20 stopped in front of his house, used his wireless network to

21 somehow engage in this type of activity that he's been engaging in,

22 a person who's downloading pornography and also distributing

23 pornography. That's just not a realistic argument.

24        Counsel is correct, however, that the Court did make an

25 incorrect reference to involvement with minors. While there is

1    some inclination– or some indication of charges, those are only

2    charges. There's no indication that he actually followed through

3    with that activity with the minor cousin. There's an inclination of

4    perhaps that he wanted to in the Internet chat, but there's no

5    indication that he did.

6          And if the Court found or thought that he did, quite frankly,

7    again, he would have been looking at a much higher sentence than

8    just the bottom of his guideline range. The other issues that have

9    been raised, I believe the Court has certainly addressed.

10         Counsel takes issue with the <u>Bistline</u> cases as setting a

11   different standard. In my reading, while Judge Graham certainly

12   believes that it sets a different standard because he's written a law

13   review article saying that it sets a different standard, but he was

14   reversed two times.

15         In my opinion, it doesn't set a different standard, but it

16   essentially follows what Congress intended, and that is for these

17   cases to be considered serious, because they are. They're very

18   serious offenses, and it's time that individuals begin to understand

19   that they are serious offenses and they will be dealt with seriously.

20         To impose a sentence of 60 months in a case such as this

21   would unduly diminish the seriousness of the offense and would

22   ignore the victims, the true victims, these children that are

23   depicted in these, in these photographs and these videos.

24         And that would be the Court's ruling with regard to the

25   objections that have been made under <u>Bostic</u>.

1          All right. Unless there are additional issues to be taken up, let

2     me see if there are before we announce a recess. Anything from the

3     United States?

4               MR. MORRIS:   Nothing further, your Honor.

5               THE COURT:   Mr. Hutson, anything else?

6               MR. HUTSON:   No. Thank you, your Honor.

7               THE COURT:   We'll be in recess.

8          (Hearing concluded at 4:04 p.m.)

### C E R T I F I C A T I O N

I certify that the foregoing is an accurate transcript of the record of
proceedings in the titled matter.

_____ */s/Donnetta Kocuba* _____                    __3/14/14__

Donnetta Kocuba, RPR-RMR
Official Court Reporter
U.S. District Court
Knoxville, Tennessee